Filed 10/26/21  P. v. Gates CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060402 |
| v. | (Super. Ct. No. C1754751) |
| BRANDON GATES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Andrea E. Flint, Judge.  Affirmed.

Sara E. Coppin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Brandon Gates stands convicted of vehicular manslaughter and other crimes for causing a fatal traffic accident while driving under the influence of alcohol. He contends his conviction must be reversed because the police did not advise him of his legal rights before questioning him about the accident, and because the trial court made several evidentiary errors that infringed his right to a fair trial. Finding these claims unavailing, we affirm the judgment.

## FACTS

At six o'clock one morning, appellant was driving with his girlfriend Julianna Quirazco on the 101 Freeway in Santa Clara County when their car crossed several lanes of traffic and crashed into the center median guardrail. The force of the crash caused their car to spin around in the opposite direction before coming to rest in the far left-hand lane of traffic. Motorist Daniel Taylor tried to steer clear of it, but he struck its right front bumper with his car and sustained hip, knee and ankle injuries as a result of the collision.

Quirazco's fate was much worse. She ended up face down on the side of the road with fatal injuries. The prosecution theorized she was thrown from her car when it initially crashed into the guardrail. And the defense argued she was not killed until Taylor ran into her car. More specifically, the defense postulated that after Quirazco's car came to rest following the initial guardrail crash, she stepped out of the vehicle and was standing near the passenger door when Taylor hit her car and she was fatally injured from the force of that second collision.

However, the medical examiner determined Quirazco died from a deceleration injury when her car stopped abruptly, she impacted a blunt object – such as the dashboard – and she lacerated the right atrium of her heart. Although Quirazco also had various avulsion injuries to the right side of her body, the medical examiner did not believe those injuries caused her death.

2

As a result of the accident, appellant suffered a broken arm and leg, a fractured pelvis and multiple contusions, abrasions and internal injuries. When paramedics questioned him at the scene, he smelled of alcohol and admitted he had been drinking. However, he said Quirazco was driving when they crashed, not him. Given the extent of his injuries, he was taken to the hospital by ambulance and treated as a tier-one trauma patient.

CHP Officer Anthony Mariscal was among the officers assigned to investigate the cause of the accident. After surveying the crash scene and interviewing witnesses there, he spoke with appellant in his hospital room at 8:15 a.m., which was roughly two hours after the accident. At that time, appellant's blood alcohol level was .149 percent. He told Mariscal he had three beers the previous evening but was not presently feeling any effect from them.

Appellant eventually backed off his insistence that Quirazco was driving and admitted he was the one who was behind the wheel at the time of the accident. He was unable to explain why he veered out of his lane and struck the center median guardrail. Although he said he and Quirazco had been arguing prior to the crash, he said their dispute was never physical, and he never mentioned anything to Mariscal about Quirazco pulling the emergency brake or otherwise interfering with his driving. He claimed that after their car came to rest following the initial guardrail crash, he told Quirazco to exit the car and saw her walk toward the front of the vehicle. Then he got out and walked to the side of the road just before Taylor hit their car.

The sole witness for the defense was accident reconstruction expert Stephen Watson. Even though appellant never mentioned anything to investigators about his emergency brake, Watson opined the emergency brake on his car was somehow applied just before the crash. Based on skid marks at the scene, Watson opined the braking caused appellant's car to spin around and hit the center median guardrail. Then, once the car came to rest facing the opposite direction, Quirazco opened her passenger door and

3

tried to make it to safety. However, as she was doing so, Taylor's car struck her vehicle, and she was fatally injured by the force of that collision.

In rebuttal, the prosecution called CHP Officer Katherine Tritenbach, a traffic collision expert who personally investigated the accident scene. Tritenbach testified the emergency brake was not engaged when she inspected appellant's car, nor did she find any evidence it had been applied before appellant crashed into the center median guardrail. In her opinion, Quirazco was ejected from the car during that initial crash and was nowhere near the car by the time Taylor ran into it.

In the end, the jury convicted appellant of vehicular manslaughter without gross negligence, driving under the influence causing injury, and driving with a blood alcohol-level of .08 percent or above causing injury. He was also found to have inflicted great bodily injury on Taylor and to have suffered a prior serious felony conviction. The trial court sentenced him to prison for six years and four months, which included time for violating probation on an unrelated case.

DISCUSSION

*Miranda Issue*

Appellant contends the admission of his statements to Officer Mariscal violated his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). However, because appellant was not in custody when he spoke to Mariscal, the officer was not required to read him his *Miranda* rights, and his statements were properly admitted into evidence.

At a pretrial hearing on that issue, Mariscal testified that by the time he arrived at the accident scene, appellant had already been transported to the hospital. Upon inspecting the inside of appellant's vehicle, he found two broken beer bottles and detected the smell of alcoholic beverages. He was also told by one of the first responders that appellant was believed to have been drinking before the crash.

4

However, when Mariscal interviewed appellant in his hospital room, he did not start out by asking him about that issue. Even though appellant smelled like he had been drinking, Mariscal just asked him general questions about what happened on the roadway. Appellant was responsive to Mariscal's questions. Although he looked down and avoided eye contact with Mariscal at times, he was calm and coherent throughout the interview. For his part, Mariscal was armed and in full uniform, but he never drew his gun or threatened appellant at any time. Rather, he spoke to appellant in a calm, professional manner. While their talk took place in a private room, medical personnel were coming in and out of the room periodically to check on appellant.

During the first part of the interview, appellant reluctantly conceded he was driving at the time of the crash. He did not offer any explanation for why he crashed but he did admit he had been drinking that night, and had also smoked marijuana. Therefore, as the interview wore on, Mariscal shifted the focus of his investigation from how the accident occurred to whether appellant was intoxicated. Among other things, he asked appellant how much he had to drink and about the condition of his car. Based on appellant's answers, and everything else he knew about the accident, Mariscal arrested him for driving under the influence and advised him of his legal rights, per *Miranda*.

All told, the interview lasted about 35 minutes. Although Mariscal never told appellant he was not under arrest and free to leave during that time, he never told him he was not free to leave either, or that he had to answer any of his questions. And at no point during the interview did appellant refuse to answer his questions or indicate he wanted to stop talking.

The trial court found the interview was lawful. It did not believe the prearrest questioning triggered *Miranda* because appellant was not in custody when Mariscal spoke to him. Therefore, the court denied appellant's motion to suppress the statements he made to Mariscal.

The *Miranda* decision was designed to protect persons suspected of criminal activity from the inherently coercive circumstances attendant police interrogations. (*Miranda, supra*, 384 U.S. at p. 444.) By requiring the police to inform a suspect of his right to remain silent before questioning, the high court sought to implement the constitutional privilege against self-incrimination and ensure "the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." (*Id*. at p. 469.)

However, "police officers are not required to administer *Miranda* warnings to everyone whom they question." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Ibid*.) In deciding the custody issue, we do not consider the "'subjective views harbored by either the interrogating officers or the person being questioned.'" (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) Rather, we must assess the objective circumstances surrounding the interrogation to determine whether a reasonable person in the suspect's position would have felt at liberty to terminate the questioning. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112–113.) This depends on whether the suspect was formally arrested or his freedom of movement was restrained to the degree associated with a formal arrest. (*Id*. at p. 465; *Stansbury v. California* (1994) 511 U.S. 318, 322; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

No single factor is dispositive of the custody issue. (*Howes v. Fields* (2012) 565 U.S. 499, 509.) However, courts have developed several factors bearing on the issue, including the length of the interrogation, where it occurred and the ratio of officers to suspects. (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.) "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the

interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404.)

Here, appellant was interviewed by a single officer for slightly over half an hour in his hospital room while medical personnel were coming in and out of the room to attend to his injuries. The setting was far less coercive than in the type of police-dominated, incommunicado interrogations *Miranda* was designed to guard against. Granted, appellant's injuries prevented him from leaving the room on his own accord, but those injuries arose from appellant's own actions. His confinement was solely for medical purposes; it was not attributable to anything the police said or did. The consensus of courts is that questioning a suspect under such circumstances is not custodial interrogation for purposes of *Miranda*. (See, e.g., *United States v. Jamison* (4th Cir. 2007) 509 F.3d 623; *United States v. Martin* (9th Cir. 1986) 781 F.2d 671; *State v. Tucker* (N.H. 1989) 557 A.2d 270, 272; *State v. Lapp* (Mont. 1983) 658 P.2d 400; cf. *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1090 [wounded suspect was not in custody when the police questioned him in the back of an ambulance].)

Appellant correctly notes the interview became somewhat accusatory about 15 minutes in, when Officer Mariscal shifted the focus of his questions to appellant's drinking and whether he was intoxicated, an area of inquiry that ultimately led to his arrest. Appellant relies on two out-of-state decisions in arguing this transformed the interview into a custodial setting under *Miranda*. (See *People v. Patel* (Ill. App. 2000) 730 N.E.2d 582; *Jordy v. State* (Tex. App. 1998) 969 S.W.2d 528.) But the United States Supreme Court has determined that targeted questioning of a person suspected of criminal wrongdoing does not necessarily trigger *Miranda*. (*Oregon v. Mathiason, supra,* 429 U.S. at pp. 495-496.) "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue[.]" (*Stansbury v. California, supra*, 511 U.S. at p. 325; accord, *People v. Moore* (2011) 51

Cal.4th 386, 402; *People v. Stansbury* (1995) 9 Cal.4th 824.)  Therefore, the accusatory nature of the latter questioning by Mariscal is not dispositive of the custody issue.

And even though Mariscal did not tell appellant he was not under arrest and free to ignore his questions during the interview, neither did he do or say anything to indicate the opposite.  Nor did he draw his gun or threaten or physically restrain appellant in any fashion.  To the contrary, Mariscal was cordial and professional throughout the interview, and appellant never asked to be left alone or to terminate the questioning.  Mariscal's queries may have made appellant feel somewhat uncomfortable – especially since he knew he'd been drinking and driving – but the totality of the circumstances surrounding the interview do not indicate the police restricted his freedom to a degree associated with formal arrest.  Consequently, *Miranda* did not apply before he was arrested, and the trial court properly admitted his prearrest statements into evidence.

*Relationship Evidence*

Before trial, the court ruled that if appellant made Quirazco's state of mind an issue by testifying she pulled the emergency brake before they crashed, the prosecution could present evidence he treated Quirazco poorly the week leading up to the accident in order to prove they had an antagonistic relationship.  In his opening appellate brief, appellant argued this ruling had an impermissible chilling effect on his right to testify.  It was appellant's position the ruling effectively forced him to choose between presenting crucial evidence about how the accident occurred and preventing the jury from hearing inflammatory and irrelevant evidence about how he had mistreated Quirazco.

The Attorney General contends this claim is procedurally barred.  He asserts appellant failed to preserve the claim for appeal because he did not testify at trial, and consequently, the prosecution did not present any evidence regarding the nature of his relationship with Quirazco.

In his reply brief, appellant admits this is true.  To his credit, he concedes he voluntarily elected not to testify, thus his claim regarding the admissibility of evidence

8

concerning his relationship with Quirazco has not be preserved for appellate review. We accept this concession and find the issue has been waived. (*People v. Ayala* (2000) 23 Cal.4th 225, 274 [defendant waived claim "the trial court's ruling denied him a constitutional right to present his defense" where he "chose not to present the testimony"]; *People v. Collins* (1986) 42 Cal.3d 378, 384 [defendant must actually testify to preserve claim the court erred in allowing him to be impeached if he took the stand].)

*Evidence Regarding Quirazco's Drug Use*

Appellant's next argument also involves the relationship between an evidentiary ruling and his decision whether or not to testify. The ruling pertains to the admissibility of evidence that Quirazco had drugs and alcohol in her system at the time of the accident. Appellant contends that by excluding this evidence, the trial court abused its discretion and violated his right to present a defense. We cannot agree.

At trial, the defense sought to admit toxicology results showing that when Quirazco died, she was suffering from "acute mixed drug intoxication" as a result of having methamphetamine, cocaine, marijuana and ethanol in her system. Appellant argued this evidence was relevant to prove Quirazco caused the accident by pulling the emergency brake in their car. However, the trial court rejected this argument for two reasons. First, the court was dubious appellant would be able to prove Quirazco's drug use made her inclined to pull the emergency brake. In other words, the court simply did not believe the drug evidence was relevant to the emergency brake issue.

Second, as a foundational matter, the court did not believe there was a sufficient factual basis for the theory that Quirazco pulled the brake. Although defense expert Watson testified the brake was somehow engaged prior to the crash, he did not know *how* that occurred. The court felt that in order for the evidence of Quirazco's drug use to be relevant, there had to be some sort of evidence linking her to the emergency brake. As it turned out, the defense did not produce any such evidence, and thus it was not allowed to present any evidence of Quirazco's drug use.

9

As for the relevancy issue, we believe the trial court was rightly concerned about the probative value of the drug use evidence. Appellant argues the evidence would have supported the inference Quirazco pulled the emergency brake while she and appellant were speeding down the highway, but that theory strikes us as speculative. While it is certainly true that people sometimes do crazy things when they are under the influence of drugs, this possibility is insufficient to convince us the trial court abused its broad discretion in excluding evidence of Quirazco's drug use absent some other evidence – either physical or testimonial – suggesting she actually pulled the brake. (See generally *People v. Jones* (2017) 3 Cal.5th 583, 609 [rulings regarding the relevance of evidence are reviewed under the deferential abuse-of-discretion standard].)

That brings us to the heart of appellant's claim. Since he was the only other person in the car with Quirazco, he contends the trial court effectively conditioned the admissibility of evidence of Quirazco's drug use on him taking the stand and supplying the necessary foundation for that evidence. Appellant contends this forced him into unconstitutional dilemma: Either he could waive his right against self-incrimination in order to get the drug evidence in, or he could assert his Fifth Amendment privilege at the cost of presenting a full and fair defense.

In so arguing, appellant relies on *Brooks v. Tennessee* (1972) 406 U.S. 605 (*Brooks*), in which the United States Supreme Court struck down a law requiring the defendant to decide whether or not to testify before any other defense witnesses took the stand. The court found this requirement violated the Fifth Amendment because it infringed the defendant's right to make a free and unfettered decision about whether or not to testify on his own behalf. (*Id.* at pp. 610-612.)

But *Brooks* also recognized a defendant's decision about whether or not to testify often impacts the admissibility of other evidence, and it is not unlawful to require the defendant to consider this possibility in deciding whether he wants to take the stand. (*Brooks, supra,* 406 U.S. at p. 609; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 628-

10

629.)  Indeed, the law is well established the "Constitution does not forbid every governmental-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights."  (*Portuondo v. Agard* (2000) 529 U.S. 61, 70.)

Accordingly, while trial courts may not impose "artificial strictures" on the defendant's decision to testify – such as the timing requirement struck down in *Brooks* – the Fifth Amendment does not prohibit courts "from excluding evidence that is not otherwise relevant unless and until the defendant lays an adequate foundation for its admissibility, *even if that foundation can only be laid through his own testimony*." (*United States v. Libby* (D.C. 2007) 475 F.Supp.2d 73, 93, italics added.)  Thus, even though the trial court's ruling regarding Quirazco's drug use implicated appellant's right not to testify, the ruling did not violate his privilege against self-incrimination.  (*Id*. at pp. 93-95.)

The ruling did not violate appellant's right to present a defense either. Even though the jury never heard about Quirazco's drug use, it was fully apprised of appellant's emergency brake theory through the testimony of defense expert Watson, who testified that deployment of the brake was what caused appellant's car to crash into the center median guardrail.  Since the exclusion of the drug use evidence did not preclude appellant from presenting evidence in support of his theory of the case, there was no violation of his due process right to present a defense.

*Animation Evidence*

Appellant asserts the trial court erred in excluding computer animations designed to illustrate his expert's theory as to how the accident occurred and how Quirazco was killed.  We uphold the court's decision to exclude the animations as a proper exercise of judicial discretion.

Before defense expert Watson took the stand, defense counsel asked the trial court if she could use three computer animations to help the jury understand Watson's opinions about the case.  According to defense counsel, the animations showed

three different visual perspectives of how Watson believed the accident occurred. She proposed that the jury be instructed that the animations were akin to charts or diagrams used by an expert witness to demonstrate his opinion. She also proposed advising the jury that the animations are "not a film of what actually occurred or an event recreation. [They are] only an aid to give you a view as to the defense version of the facts, based on particular viewpoints and based on interpretation of the evidence."

The prosecutor opposed the animations on the ground of late discovery (she did not receive the final version of the animations until the very day of the hearing), and on the basis they amounted to substantive simulations, as opposed to mere demonstrative aids. In addition, the prosecutor expressed concern the animations did not accurately reflect the factual circumstances under which the accident occurred.

After reviewing the proposed animations, the trial court denied defense counsel's request to use them to illustrate Watson's opinions, due to late discovery and because they were misleading in depicting how the accident occurred. Regarding the latter basis for exclusion, the trial court determined the animations did not accurately reflect the traffic conditions at the time of the accident, and they presumed the headlights on appellant's car went off at a particular point in time, when in fact, the evidence was inconclusive as to when they went off. Therefore, the court exercised its discretion under Evidence Code section 352 to exclude the animations from the trial altogether.

As our Supreme Court has explained, a computer animation may be used "as demonstrative evidence of expert testimony, but only if certain conditions are met. The animation must accurately depict an expert opinion, the expert opinion must fairly represent the evidence, the trial court must provide a proper limiting instruction, and the animation must be otherwise admissible under Evidence Code section 352." (*People v. Caro* (2019) 7 Cal.5th 463, 509, citing *People v. Duenas* (2012) 55 Cal.4th 1, 20-25.)

Evidence Code section 352 permits the trial court to exclude evidence if its probative value is substantially outweighed by the probability its admission will create

substantial danger of confusing the issues or misleading the jury. We will not disturb a trial court's decision to exclude evidence under this section unless the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

As explained above, the trial court based its decision to exclude appellant's late-produced computer animations in part on the ground they were likely to mislead the jury, given that they did not accurately reflect the traffic conditions at the time of the accident and contained assumptions about when the headlights on appellant's car went off following the initial crash. Since appellant does not dispute the animations were inaccurate in that regard, the trial court's decision was not arbitrary, capricious or patently absurd.

Moreover, the decision did not result in a manifest miscarriage of justice to appellant because, even without the proposed computer animations, his expert witness was able to convey his opinions about the accident to the jury in great detail. Because his testimony created a vivid picture of how he believed the accident occurred, and how Quirazco was killed, the exclusion of the animations is not cause for reversal.

*Defense Request to Reopen its Case*

Appellant would also have us believe the trial court abused its discretion in refusing to allow him to reopen his case to call an expert witness the prosecution had consulted about the cause of the accident. Again, we disagree.

To put appellant's claim in context, a brief overview of events will be helpful. The record shows the prosecution rested its case-in-chief on May 9, 2017. That same day, defense expert Watson took the stand and began to articulate his theories about the case. He was about halfway through his testimony when the court adjourned proceedings for the day.

That evening, the prosecutor contacted Kevin Cassidy, a former San Jose Police Officer, to get his opinion regarding the cause of Quirazco's death. After

13

reviewing the case materials, Cassidy felt there was not enough evidence for him to disagree with Watson's theories about the case, meaning he could not disprove Quirazco was killed in the manner that Watson postulated.

The following day, May 10, the prosecutor informed defense counsel of Cassidy's opinion in that regard. Watson also concluded his trial testimony that day.

On May 11, the prosecutor called expert witness Tritenbach on rebuttal to refute Watson's opinions. Tritenbach finished her testimony, and the prosecution rested its case, that same day.

Closing arguments took place five days later, and the jury received the case the following morning, on May 17. That same morning, defense counsel asked the trial court if she could reopen her case for the purpose of calling Cassidy as an expert witness on the cause of Quirazco's death. Alternatively, defense counsel requested that the jury be provided a written exhibit explaining that Cassidy was unable to refute the opinions offered by defense expert Watson.

The trial court denied the requests. It did not believe they were timely made, given the fact defense counsel received notice of Cassidy's opinions a full week before she brought the issue to the court's attention. Furthermore, the court did not believe Cassidy's proposed testimony was of sufficient probative value to justify reopening the case for additional evidence at that late stage of the case.

"The decision to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court." (*People v. Jones* (2012) 54 Cal.4th 1, 66.) "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.'" (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

14

Appellant argues a proper analysis of these factors compels the conclusion the trial court abused its discretion in denying his request to reopen for the purpose of calling Cassidy to the witness stand.  In so arguing, appellant complains the trial court put too much emphasis on the timeliness of his request and failed to recognize the significance of Cassidy's testimony.  However, he does not dispute the case had already been fully argued and was in the hands of the jury by the time his attorney mentioned anything about Cassidy to the court.  Given that defense counsel was apprised of Cassidy's opinions a full week earlier, while the evidentiary phase of the trial as still going on, the trial court was rightly concerned about the timing of her request to reopen. (See *People v. Monterroso* (2004) 34 Cal.4th 743, 779 [a request to reopen may properly be denied if the evidence sought to be admitted was available during the trial].)

Moreover, as appellant admits, the only reason he wanted to call Cassidy as a witness was to show he agreed with Watson regarding the cause of the accident and how Quirazco was killed, or at least he did not believe there was sufficient evidence to refute Watson's opinions in that regard.  Courts have broad discretion to exclude expert testimony that is cumulative of testimony given by another expert.  (Evid. Code, §§ 352, 723; *People v. Dean* (2009) 174 Cal.App.4th 186, 203-204.)  Seeing that Cassidy did not have anything new to offer about the case, the trial court did not abuse its discretion in denying defense counsel's request to get his opinions before the jury.

For the same reason, we reject appellant's backup argument that defense counsel was ineffective for failing to bring up the issue of Cassidy's opinions in a more-timely fashion.  Given the cumulative nature of Cassidy's proposed testimony, it is not reasonably probable appellant would have received a more favorable verdict had the jury heard from Cassidy or learned of his opinions.  Therefore, defense counsel's failure to pursue the matter with greater diligence is not cause for reversal.  (See *Strickland v. Washington* (1984) 466 U.S. 668.)

15

*Cumulative Error*

Lastly, appellant contends the cumulative effect of the trial court's evidentiary errors compels reversal. Having found no such errors, we reject this argument as well.

DISPOSITION

The judgment is affirmed.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16